**THE DISTRICT COURT OF GUAM**

| | |
|---|---|
| UNITED STATES OF AMERICA, | CRIMINAL CASE NO. 15-00031 |
| Plaintiff, | |
| vs. | **DECISION AND ORDER RE DEFENDANTS' MOTION TO SUPPRESS ALL EVIDENCE SEIZED IN SIENNA VAN, INCLUDING 8.41 POUNDS OF METHAMPHTHETAMINE VALUED AT APPROXIMATELY $1,907,354.36** |
| RAYMOND JOHN MARTINEZ and JUANITA MARIE QUITUGUA MOSER, | |
| Defendants. | |

Before the court is Defendant Juanita Marie Quitugua Moser's Motion to Suppress Seized Narcotics. Mot. Suppress, ECF No. 24.[1] On August 23, 2016, a twelve day suppression hearing on the matter commenced. After reviewing the parties' submissions, and relevant caselaw and authority, and having heard argument from counsel on the matter, the court hereby **DENIES** the Motion, for the reasons stated herein.

## I.    CASE OVERVIEW

### A.    Procedural Background

On June 5, 2015, Defendant Raymond John Martinez ("Martinez") and Juanita Marie Quitugua Moser ("Moser") (collectively, "the Defendants") were charged in a Criminal Complaint in the Central District of California for violations of 21 U.S.C. § 841(a)(1) and

---

[1] A separate decision will be issued on Defendants' Motion for Suppression of Seized Narcotics Due to Unlawful Use of GPS Device. *See* ECF No. 86.

1

(b)(1)(A)(viii), specifically possession with the intent to distribute approximately 8.41 pounds[2] of methamphetamine. *See* Mot. Ex. 1 (Compl. & Aff.), No. 24-1.[3]

On June 10, 2015, an Indictment was returned against Defendants in the District Court of Guam charging Defendants with Count 1: Conspiracy to Distribute Methamphetamine Under 21 U.S.C. §§ 846 & 841(b)(1)(A)(viii); Count 2: Attempted Possession with Intent to Distribute Methamphetamine Hydrochloride under 21 U.S.C. § 841(b)(1)(A)(viii) and 18 U.S.C. § 2; Count 3: Conspiracy To Commit Money Laundering under 18 U.S.C. §§ 1956(a)(1)(A)(i), (a)(1)(B)(i), (h), & 1957; Count 4: Conspiracy To Commit Money Laundering Under 18 U.S.C. § 1957(a) & (b), as well as forfeiture charges. *See* Indictment, ECF No. 1.

On July 1, 2015, a Superseding Indictment was returned against Defendants, which removed Count 2 (Attempted Possession with Intent to Distribute Methamphetamine Hydrochloride).[4] *See* Superseding Indictment, ECF No. 12. Both Defendants appeared at the arraignment in Guam on July 10, 2015, and were released on bond. *See* Mins., ECF No. 16.

Moser filed a Motion to Suppress Seized Narcotics ("Motion") on August 28, 2015. *See* Mot. Suppress Narcotics, ECF No. 24. Martinez filed a Joinder to the Motion on September 28, 2016. Joinder in Mot., ECF No. 200. The United States filed an Opposition on September 14, 2015. Opp'n, ECF No. 38. Moser redacted portions of the Motion on October 6, 2015, and filed a Reply on November 13, 2015. *See* Redacted Supplemental Points and Authorities in Support of Motion, ECF No. 59; *see also* Reply, ECF No. 64.

---

[2] The street value of narcotics in Guam is approximately $500.00 per gram, meaning that approximately $1,907,354.36 in narcotics was seized from Defendants' van.

[3] The attached exhibit only shows the Complaint for Moser, not for Martinez. *See* Mot. Ex. 1 (Compl. & Aff.), No. 24-1.

[4] The charging statutes also changed slightly from the original Indictment. The Attempted Possession with Intent to Distribute Methamphetamine Hydrochloride was omitted. Count 1 now included 21 U.S.C. § 841(a)(1), Count 2 (originally Count 3) no longer included 18 U.S.C. § 1957, and Count 3 (originally Count 4) now included 18 U.S.C. § 1956(h). *Compare* Indictment, ECF No. 1, *with* Superseding Indictment, ECF No. 12.

2

The suppression hearing commenced on August 23, 2016, and continued for several weeks. *See* Mins., ECF Nos. 151, 154, 157, 158, 159, 161, 164, 166, 167, 172, 177, 204.

The court requested supplemental briefing on September 15, 2016. Order, ECF No. 180.

### B.    Factual Findings

Homeland Security Investigation ("HSI") Special Agent Erfel Matanguihan ("Matanguihan") began investigating Defendants on July 9, 2014, when he received a telephone call from a Transportation Security Administration ("TSA") officer who observed Defendant Raymond John Martinez ("Martinez") carrying a suspicious bag when boarding his flight bound for Tokyo, Japan, with a final destination of Los Angeles, California. When questioned, Martinez informed a TSA officer that he was carrying $50,000.00 in the bag. This money was not declared when Martinez departed the United States, even though it is required by law for a traveler to declare when traveling internationally with over $10,000.00. Martinez and Defendant Juanita Marie Quitugua Moser ("Moser") had boarded their flight by the time Matanguihan and other HSI agents arrived at the airport.

Matanguihan testified that he received information from Special Agent Blu Shiroma ("Shiroma")[5] that Defendants were unemployed, but lived a "lavish lifestyle." Shiroma told Matanguihan that he suspected Martinez was involved in an indoor marijuana grow operation in Guam, and also that he was allegedly associated with a group that distributed methamphetamine sourced from California.

Matanguihan called the HSI office in Los Angeles, California, and informed the agent on duty, HSI Special Agent Matthew Hernandez ("Hernandez"), that Martinez boarded a flight bound for Los Angeles with more than $10,000.00 without declaring the money as required by

---

[5] Shiroma testified that he was previously romantically involved with Martinez's ex-girlfriend.

law. Matanguihan requested Hernandez to conduct a secondary stop of the Defendants when they arrived in Los Angeles. According to Hernandez, Martinez completed the required FinCEN form 105 when he arrived in Los Angeles on July 9, 2014. Martinez declared that he had $100,000.00 in United States Currency in his possession, which was $50,000.00 more than what he previously told the TSA officer in Guam.[6] *See* FinCEN Form, Gov.'s Ex. 30.

During the secondary search in Los Angeles, Hernandez reviewed documents in Martinez's possession that raised his suspicion. One such document was a bill of sale form from Triple B Forwarders involving the sale of a 2006 Hummer to an individual named Eric Sanabia ("Sanabia"). Bill of Sale, Gov.'s Ex. 28-3.

According to the Bill of Sale, Martinez received $100,000.00 from Sanabia on May 4, 2014. *Id.* The Bill of Sale also indicated that the Hummer's mileage was 22,725 at the time of the sale. *Id.* Yet when Hernandez reviewed the vehicle inspection form dated May 25, 2014, that was transcribed by Triple B Forwarders, it appeared that the Hummer's mileage was 227,293. Vehicle Inspection Form, Gov.'s Ex. 28-1. Hernandez testified that he was suspicious about the transaction because the mileage appeared to increase roughly 200,000 miles over a short time-span. Hernandez testified that his suspicions about Martinez were further aroused when a records check revealed Sanabia was associated with smuggling drugs in vehicles from Mexico. In Hernandez's assessment, Martinez appeared to be over-explaining the money and had excessive documentation for the vehicle.[7]

Matanguihan then opened a financial investigation case on Martinez.

---

[6] The currency was not seized at this time because Martinez declared the funds when Customs and Border Patrol gave him the opportunity.

[7] Hernandez testified the price of the Hummer was suspicious due to the low-end Kelly Bluebook value of a Hummer with mileage in excess of 200,000.

4

HSI Special Agent Erwin Fejeran ("Fejeran") introduced a Cooperating Defendant ("C.D.") to Matanguihan as a potential informant that could help further his investigation into the Defendants' activities. The C.D. is a former Guam Customs and Quarantine Agency Lieutenant who pled guilty to the offense of Conspiracy to Defraud and to Deprive Honest Services. CR 15-00022-001 Indictment at 2, ECF No. 1, Plea Agreement at ¶ 1, ECF No. 50.[8]

Matanguihan debriefed the C.D. regarding his investigation into Defendants, and the C.D. told Matanguihan that he and the Defendants had discussed[9] bringing drugs into Guam in the past.

**1. Recorded Conversations Between the C.D. and Defendants**

On May 1, 2015, the C.D. called the Defendants. *See* Gov.'s Ex. 41d-3. Matanguihan and the C.D. developed a cover story that the C.D. needed Defendants' assistance to repair his scooter. *See* Gov.'s Exs. 41d-3.[10] During the initial conversation, Martinez indicated "nothing's been going on," but when asked if he still had "the hookups back there? To find stuff," Martinez replied "Yeah I do." *See* Gov.'s Exs. 41d-9-10.

The C.D. met with Defendants on May 2, 2015, and discussed how certain individuals "are popping stuff all the time through the mail." *See* Gov.'s Exs. 59, 60-47-48. Defendants asked the C.D. how the X-ray machine was used at border and mail searches. *Id.* at 60-47.

---

[8] The Plea Agreement contains a provision for substantial assistance. CR 15-00022-001 Plea Agreement at ¶ 21, ECF No. 50.

[9] When Special Agent Erwin Fejeran ("Fejeran") testified at the Suppression Hearing, he clarified that paragraph 30 of his Affidavit in Support of an Application for a Search Warrant of Defendants' Guam Residence erroneously stated that Defendants "told him" about an illegal drug transport from California to Guam in vehicles. Instead, Fejeran elucidated that Defendants and the C.D. merely discussed the possibility of such a transport.

[10] All of the meetings and telephone calls between C.D. and the Defendants were recorded and monitored by Matanguihan.

5

Although the term methamphetamine was not explicitly used by Defendants, Martinez stated that when crossing the border, he was planning on cutting the nerf bar on the right side of the interior of the vehicle, "pack it with grease, and then put the *stuff* in there . . . . Repack it with grease . . . [and] seal it right." Gov.'s Ex. 60-48-9 (emphasis added). When the C.D. asked Defendant if he had done that before, Martinez replied that "we sourced out a couple of people" who "run it across the main border, in from . . . Mexico." Gov.'s Ex. 60-49. These individuals apparently have "it down to a science," and know how "many pounds" would fit in a given "transfer case." *Id.* Moser also discussed the possibility of doing "it in liquid," and that there were methods to "rock it back up." *Id.* The C.D. also asked Martinez if he had "the stuff," and Martinez replied that they "don't have any more stuff sitting" and that he gave "[t]he one that's out there . . . to [his] cousin to sell." *Id.* at 60-54. Eventually the meeting terminated. Gov.'s Ex. 60-66-67.

On May 5, 2015, the C.D. met with Defendants at Scooter World to pick up his scooter. *See* Gov.'s Exs. 61, 62-1-2. During this meeting Defendants and the C.D. discussed "putting together a Jacuzzi." *See* Gov.'s Ex. 62-6. The C.D. volunteered to send the Jacuzzi, water pumps, and rock salt to Guam via the freight forwarder under his name. *Id.* Moser asked the C.D. if he would be "under the spotlight" at his work, and the C.D. replied that he did not think so. Gov.'s Ex. at 62-7. The C.D. suggested that maybe they could "put 'it' in the rock salt." *Id.* Moser replied that "[t]he consistency matches." *Id.* When Moser asked the C.D. if "it" will look alright when placed through the X-ray, the C.D. responded that it would simply look like pool supplies. *See* Gov.'s Ex. 62-8-9. Martinez offered to "pack it" himself by vacuum sealing it and using air freshener because he would not trust anyone else to pack it properly. *Id.* The air freshener would "mask it" just in case "they put dogs on it . . . [b]efore it comes" to Guam. *See* Gov.'s Ex. 62-26.

6

The Defendants further discussed the C.D.'s "cut" for the "pies." Gov.'s Ex. 62-27. Martinez asked if $100,000.00 or $150,000.00 would be sufficient. *Id.* Moser asked the C.D. if he wanted "like 150? 200?" and the C.D. responded that was too much. Gov.'s Ex. 62-28. Martinez also mentioned that he had $27,000.00 sitting in California. Gov.'s Ex. 62-28-9. Shortly thereafter, the meeting ended. Gov.'s Ex. 62-30.

On May 12, 2015, Defendants met the C.D. at Guam Premier Outlets. *See* Gov.'s Exs. 63; 64-1. Martinez told the C.D. that "we already sourced out the five gallon buckets out there," and that once they got "out there," they "put the salt in and . . . the thing in", and would prepare the buckets by placing Morton salt stickers on them. Gov.'s Ex. 64-2 (Martinez noted that Morton salt makes a water softener and purifier). The C.D. was instructed by Martinez to buy the salt in California so that he would have a receipt proving purchase. Gov.'s Ex. 64-3. Martinez also stressed that the weight of the bucket needed to be "forty pounds" because that is how much the Morton salt buckets are supposed to weigh. Gov.'s Ex. 64-3-4. Defendants planned on printing exact Morton salt labels to place on the buckets that the C.D. could send to Guam via a freight forwarding company. Gov.'s Ex. 64-3-8.

Moreover, during the recorded conversations Martinez discussed Defendants' plan to have someone else transport the Morton salt labels for the buckets made in Guam to California. Gov.'s Ex. 64-4-5. Martinez planned to wear gloves when packing the buckets to avoid leaving fingerprints, and also planned to use denaturing alcohol to wipe the buckets down. Gov.'s Ex. 64-21.

During the meeting, Martinez stated that he and Moser planned to arrive in California on May 26, 2015. Gov.'s Ex. 64-2. After they arrived, Defendants would go south, and "shoot to Vegas," where they would "stash it somewhere . . . or drive with it." Gov.'s Ex. 64-11. Martinez hoped for "six" pounds, but stated that "right now it's only four." *Id.* Martinez did not

7

want to bring "this" into his mother's house out of respect for her, and also told the C.D. that Customs had his mother's information.  Gov.'s Ex. 64-14.

Moser asked the C.D. if he could carry $20,000.00 to California, and the C.D. agreed to carry $15,000.00 for the Defendants.  Gov.'s Exs. 64-11-12.  Martinez expressed concern about being "stuck" so that he would have to "take the money back and stash it" in California.  Gov.'s Ex. 64-19.  Apparently, Martinez was "stuck with four out there already," and "[i]t was sitting so [he] had a credit" but "had to get rid of it cause that thing has a shelf life."  *Id.*  When the C.D. asked "[h]ow big was that one," Martinez responded that it was probably "ten."  *Id.*  This was problematic because Martinez had "used some of the money to get [a] Mercedes."  *Id.*  The meeting eventually ended.  Gov.'s Ex. 64-32.

The C.D. again met with Defendants on May 22, 2015 at Guam Premier Outlets.  *See* Gov. Exs. 65 and 66-1.  During this meeting, Martinez showed the C.D. Morton salt labels that Defendants recreated to place on the side of the white buckets.  *See* Gov. Exs. 65 and 66-2-3. Martinez stated he had three (3) labels and one (1) extra in case something went wrong.  *Id.* During the meeting, Defendants stated that special care was taken to recreate the water flow on the labels.  *Id.* at 66-3.  Martinez expressed that he did not want the labels "to look cut," and "want[ed] everything to flow," while Moser commented that the rain "look[ed] legit."  *Id.* at 66-3.  In response to the C.D.'s question regarding who would take the labels to Los Angeles, Martinez stated someone else would bring the labels and Defendants would "meet them out there."  *Id.*  He further said that the labels would be placed in a sealed envelope "so they won't even know what it is," and also that "they" were "taking some money for [Defendants] . . . out there."  *See id.* at 66-3-4.  When the C.D. asked Defendants how much money they would bring to Los Angeles, Martinez responded that "we're gonna try to bring 50 wraps.  Here's your fifteen right there.  For you.  That's the one you're gonna bring, so that's all hundreds.  Fifteen

8

thousand. Lysol clean, everything straight from the bank." *See id.* at 66-4; *see also* Gov.'s Ex. 65 (Martinez handed the C.D. an envelope).

Martinez acknowledged that as far as finances, he would be "short a little for the thing," but that it was alright because "the credit's good." *See* Gov.'s Ex. 65; *see also* Gov.'s Ex. 66-5. The plan was to meet with the C.D. after the Defendants' wedding in Las Vegas for the purpose of "giv[ing the C.D.] the bucket and [to] grab that money" so that Defendants could "shoot back down" to San Diego to "pay the balance of it." *Id.* The C.D. stated that he thought "that the stuff was . . . paid for already." *See* Gov.'s Ex. 65; *see also* Gov.'s Ex. 66-6. In response, Martinez indicated that they were "shooting for six" so that the buckets could each contain "three," but that there was a guaranteed "four." *Id.* Martinez then told the C.D. that he would give him his "burner" phone number, and that they would meet up on June 4, 2015. *See* Gov.'s Ex. 65; *see also* Gov.'s Ex. 66-8-9. The Defendants and the C.D. then parted ways. *See* Gov.'s Ex. 65; *see also* Gov.'s Ex. 66-11.

On his way to meet with Matanguihan, the C.D. received a telephone call from Moser asking him how much he would want to sell his "jet ski" for. *See id.*

On June 1, 2015, the C.D. called Moser, who informed him that "everything is already good to go." *See* Gov.'s Ex. 52; *see also* Gov.'s Ex. 53b-2. Martinez informed the C.D. that he needed to purchase two buckets for the receipt. *See* Gov.'s Ex. 52; *see also* Gov.'s Ex. 53b-3. When the C.D. asked Moser "how many do you have," Moser responded "a good enough amount. . . . I think seven." *See id.* Moser reiterated that everything was "all ready to go," and confirmed that they would meet the C.D. on June 4, 2015. *See* Gov.'s Ex. 52; *see also* Gov.'s Ex. 53b-4.

On June 3, 2015, Martinez told the C.D. that he and Moser would meet him at 10:30 a.m. on June 4, 2015, although Martinez requested to meet earlier. *See* Gov.'s Ex. 54; *see also* Gov.'s

Ex. 55c-2.  During this conversation, Martinez told the C.D. that he would like to "drop this thing to you," and that he would drive to see the C.D. and "dump this thing in [the C.D.'s] trunk."  *See id.*  Martinez again reiterated that he was "good to go" and that "everything [was] ready to rock and roll."  *See* Gov.'s Ex. 54; *see also* Gov.'s Ex. 55c-3.

On June 4, 2015, the C.D. and the Defendants exchanged several telephone calls.  *See* Gov.'s Ex. 56; *see also* Gov.'s Ex. 57.  Martinez and the C.D. agreed to meet at a Starbucks near a Home Depot and Walmart in Torrance, California, so that the C.D. could "get the stuff."  *See* Gov.'s Ex. 56; *see also* Gov.'s Ex. 57a-3-4.  The C.D. provided an address, 24451 Crenshaw Boulevard, at or near the Home Depot in Torrance, California.  *See* Gov.'s Ex. 56; *see also* Gov.'s Ex. 57a-3.  Martinez expressed that was a desirable location because it was near Triple B Forwarders.  *See* Gov.'s Ex. 56; *see also* Gov.'s Ex. 57a-4.  Before hanging up, Martinez told the C.D. that "everything is ready to rock and roll so you should be good to go," and that "everything came out really really nice."  *Id.*  The call ended approximately 8:22 a.m.  *See id.*

At approximately 10:43 a.m., the C.D. called Martinez, who informed him that he and Moser were at the Starbucks in the Vons next door to the Home Depot.  *See* Gov.'s Ex. 56; *see also* Gov.'s Ex. 57b-1-2.  Martinez expressed concern that there were "a lot of cops around," and wanted to stay where he was.  *Id.*  The C.D. requested that Martinez drive to the Best Buy at 3737 Pacific Coast Highway, which was about two miles from Defendants' location so that they could "throw it in the car or something."  *See* Gov.'s Ex. 56; *see also* Gov.'s Ex. 57b-3.  The call ended at approximately 10:47 a.m.  *See id.*

At approximately 10:56 a.m., the C.D. called Defendants, and requested that they come to Best Buy."  *See* Gov.'s Ex. 56; *see also* Gov.'s Ex. 57c-2-3.  Moser asked if they could "just put it into [the C.D.'s] ride."  *See* Gov.'s Ex. 56; *see also* Gov.'s Ex. 57c-3.  Moser indicated she

and Martinez were on their way to the Best Buy, and would meet the C.D. inside. *See* Gov.'s Ex. 56; *see also* Gov.'s Ex. 57c-3. The call ended at approximately 10:59 a.m.

### 2. Surveillance Team Briefing and Request for Patrol Officer Assistance

On June 4, 2015, at 7:00 a.m., the Torrance Police Department Vice and Narcotics Team, including Officer Anthony Chavez and Officer Vazquez, met with Hernandez and other HSI agents at a Carl's Junior fast food restaurant nearby Defendants' location. Hernandez briefed the surveillance team regarding the case at the meeting. The team discussed, *inter alia*, whether the case would proceed at the federal or state level. Hernandez also met with Matanguihan and the C.D. that morning as well.

The Torrance Police Department Vice and Narcotics Team acted as the primary visual surveillance team, and began observing Defendants at approximately 8:00 a.m. on June 4, 2015. Hernandez and Chavez testified that the team never lost visual surveillance of Defendants.

### 3. The Traffic Stop

As Defendants drove towards Best Buy, Torrance Police Department ("TPD") Officer Ryan Schmitz ("Schmitz") pulled over Defendants' vehicle. Schmitz testified that he is a patrol officer who has been employed by the TPD for the last five years. Tr. at 4-5 (Mot. Hr'g, August 26 & 29, 2016). On June 4, 2015, Schmitz was working with his partner, Officer Craft ("Craft"). *Id.* at 5. Prior to the stop, Schmitz was contacted by TPD vice and narcotics Detective Vazquez.[11] *See id.* at 5, 24-25, 190, 220. Vazquez told Schmitz that there would be a "newer model, gray, Toyota Sienna" in the area of Crenshaw and Lomita. *Id.* at 5. Vazquez also informed Schmitz of the Toyota Sienna's license plate number; however, he did not give Officer

---

[11] Chavez testified that Detective Vazquez was part of his surveillance team, and he coordinated a wall stop with the patrol division of the TPD. Vazquez is the only Detective involved in the investigation that Schmitz spoke to prior to the stop. Tr. at 109-10 (Mot. Hr'g, August 26 & 29, 2016).

Schmitz any information about the vehicle's occupants. *Id.* at 6. On cross-examination, Schmitz testified that when he receives a call from a vice and narcotics Detective like the one he received "you most likely want to go to that area." *Id.* at 26. Schmitz further testified that when receiving a call similar to the one he received, there is an assumption that "narcotics, stolen property, [or] firearms," are involved. *Id.* Moreover, Schmitz stated that intrinsic in that assumption is not that he has to stop the vehicle but that he "would like to stop it." *Id.*

Schmitz clarified that he was walled off from the surveillance team, and described what is known as a "wall stop." *Id.* at 210-11, 219. A wall stop usually involves a surveillance team related to a vice or narcotics investigation involving some kind of informant that the team is trying to protect. *See id.* at 210. The patrol officer receiving a communication from the surveillance team does not "ask questions," but instead:

> [J]ust go[es] there and . . . attempt[s] to develop [their] own independent probable cause by stopping that car, and from there, if [the patrol officer is] able to search the vehicle, if [the patrol officer has] some type of probable cause, [the patrol officer goes] ahead and do[es] so. [The patrol officer] conduct[s their] own investigation.

*Id.*

Vazquez's communication did not order Schmitz to be near the Pacific Coast Highway, did not give guidance regarding which direction to travel on the Pacific Coast Highway, and did not order Schmitz to stop the Defendants' van. *Id.* at 193, 216. Instead, Schmitz attempted to find his own probable cause to make a traffic stop. *Id.* at 27.

Schmitz testified that he followed the Sienna until it turned in to a shopping center, but did not stop the Sienna because he did not observe any traffic violations. *Id.* at 72. Vazquez called Schmitz a second time, telling him he might want to be in the area of Pacific Coast Highway and Rolling Hills Way. *Id.* at 25.

12

Schmitz testified that he used "bumper pacing" to determine that Defendants were traveling seven miles over the speed limit, at approximately 52 miles per hour in a 45 miles per hour zone in violation of Cal. Veh. C. § 22350. Tr. at 8, 70 (Mot. Hr'g, August 26 & 29, 2016); *see also* General Case Report for Incident 150032429 ("Schmitz Report") at 3, Gov.'s Ex. 23-3. As Defendants approached the intersection of Rolling Hills Way and Madison, Schmitz testified that he observed Defendants make an abrupt lane change from the number two lane to the number three lane. Tr. at 98 (Mot. Hr'g, August 26 & 29, 2016); *see also* Schmitz Report at 3, Gov.'s Ex. 23-3. This maneuver caused the vehicle to apply their brakes to avoid a collision, which is a violation of Cal. Veh. C. § 21658(a). *See id.*

Schmitz and Craft stopped Defendants' vehicle at approximately 11:10 a.m. near the intersection of Pacific Coast Highway and Madison. *See* Schmitz Report at 3, 7, Gov.'s Ex. 23-3; 23-7. Martinez was driving the vehicle, and presented his valid Guam driver's license to Craft. Tr. at 128 (Mot. Hr'g, August 26 & 29, 2016); Schmitz Report at 3, Gov.'s Ex. 23-3. Moser was in the passenger's seat and presented hers as well, but Schmitz does not recall if he or Craft examined her license.[12] *Id.* Both Defendants were directed to exit the vehicle. *See* 10-11, 194-95 (Mot. Hr'g, August 26 & 29, 2016). Craft conducted a driver's license check for both Defendants, and determined that Martinez had a prior address in Huntington Beach, and also that Martinez's prior California driver's license status showed that it was "suspended or revoked" in violation of Cal. Veh. C. § 14601.1(a). *See* Tr. at 48-49, 194-95 (Mot. Hr'g, August 26 & 29, 2016); Schmitz Report at 3, 6-7, Gov.'s Ex. 23-3, 23-6-7. The Department of Motor Vehicles ("DMV") Return for Martinez within Schmitz's report appears to have been completed by 11:15 or 11:17 a.m. *See* Schmitz Report at 6-7, Gov.'s Ex. 23-6-7.

---

[12] The rental agreement for the Sienna van was in Moser's name. *See* Tr. at 41 (Mot. Hr'g, August 26 & 29, 2016); Schmitz Report at 3, Gov.'s Ex. 23-3. Defendants presented this agreement to Schmitz and Craft. *Id.* at 192-93.

13

There was no testimony or other evidence presented that either Defendant appeared nervous, or that there was an odor of drugs emanating from the vehicle. There was also no evidence presented that Defendants consented to a search of the vehicle.[13]

At 11:23 a.m., Schmitz requested a K-9 unit from Redondo Beach to assist with the traffic stop. *See* Tr. at 141 (Mot. Hr'g, August 26 & 29, 2016) (noting that the computer time stamps an officer's communication with a dispatcher); Schmitz Report at 7, Gov.'s Ex. 23-7. At 11:28, Schmitz was notified by a dispatcher that a K-9 was available. *See* Tr. at 149 (Mot. Hr'g, August 26 & 29, 2016); Schmitz Report at 7, Gov.'s Ex. 23-7.[14]

Schmitz initially testified that he began filling out the citation around 11:17 a.m. *See* Tr. at 12 (Mot. Hr'g, August 26 & 29, 2016). On cross-examination, Schmitz clarified that he began writing the ticket sixteen minutes later at 11:33 a.m., which is the time that appears on the citation.[15] *See* Tr. at 195 (Mot. Hr'g, August 26 & 29, 2016); Notice to Appear, Gov.'s Ex. 39.

Schmitz also testified that it typically takes ten to fifteen minutes to issue a traffic citation. *See* Tr. at 197-98 (Mot. Hr'g, August 26 & 29, 2016). When pressed further, Schmitz testified that follow-up questions extended that time in this case because he thought Martinez lied about his license, and was curious about Martinez's Huntington Beach address. *Id.* at 198. Follow-up questions, according to Schmitz, can extend an investigation to twenty or thirty minutes to complete. *Id.* at 198-99.

---

[13] Schmitz did not observe any type of drug evidence prior to the traffic stop or the K-9's arrival. *See* Tr. at 202 (Mot. Hr'g, August 26 & 29, 2016)

[14] Schmitz's probable cause determination, on the other hand, states that the K-9 arrived "simultaneously . . . on the scene." *See* Mot. Suppress Narcotics Ex. 6 (Probable Cause Determination (Declaration)), ECF No. 24-2.

[15] Schmitz admitted that this was 23 minutes after the initial stop, which occurred at 11:10 a.m. *See* Tr. at 195 (Mot. Hr'g, August 26 & 29, 2016).

14

The citation was filled out from top to bottom, and Schmitz indicated that "sometimes [he has] to look . . . up the specific violation to get it correct," which is the last thing he would do when issuing a citation. *See* Tr. at 157-58, 201, 211-12 (Mot. Hr'g, August 26 & 29, 2016). The citation itself is a "Notice to Appear," with a hearing date of August 15, 2015, with slash marks through the boxes for the vehicle speed. Notice to Appear, Gov.'s Ex. 39. The only violation written on the citation is a misdemeanor violation for driving with a suspended license pursuant to Cal. Veh. Code 14601.1(a). *Id.*[16]

Redondo Beach Police Department Officer Daniel Richey and his canine Blitz[17] arrived at the scene at 11:34 a.m., one minute after Schmitz testified he began writing the citations.[18] *See* Tr. at 202-03 (Mot. Hr'g, August 26 & 29, 2016); *see also* Notice to Appear, Gov.'s Ex. 39; Schmitz Report at 7, Gov.'s Ex., 23-7; Redondo Beach Police Narcotic K9 Report ("Richey Report"), Gov.'s Ex. 58-1-2.[19] Defendants denied Richey's request to search the vehicle. Richey Report, Gov.'s Ex. 58-1.

Richey deployed Blitz around the exterior of the vehicle. *Id.* Blitz exhibited a breathing change when he reached the open front passenger window, and followed the vehicle around to the driver's window. *Id.*[20] When Blitz reached the front of the driver's side rear tire, he

---

[16] Driving with a suspended driver's license is an arrestable offense. *See* Tr. at 154-55 (Mot. Hr'g, August 26 & 29, 2016).

[17] Blitz is trained and certified in detecting narcotics odor. Richey Report, Gov.'s Ex. 58-1.

[18] Schmitz did not discuss the matter with Richey prior to Richey's arrival on the scene. Tr. at 110 (Mot. Hr'g, August 26 & 29, 2016).

[19] The computerized CAD call information that serves as a supplement to Schmitz's Report appears to show that Schmitz called the dispatcher at 1:20 p.m. on June 4, 2015 to ask when the K-9 arrived. Schmitz Report at 7, Gov.'s Ex., 23-7. The unit arrived at 11:34 a.m. *Id.*

[20] During the canine's search, an object fell from the car. *See* Tr. at 14 (Mot. Hr'g, August 26 & 29, 2016). Richey notified Schmitz that the object fell, and Schmitz exited his

15

exhibited a positive alert to the presence of narcotics odor. *Id.* Once Blitz alerted, Richey informed Defendants that he had probable cause to believe narcotics were in the vehicle, and continued the search. *Id.*[21] Blitz alerted again in the middle interior of the vehicle. *Id.*

Richey, Schmitz and Craft proceeded with a hand search of the vehicle, and located two large garbage bags behind the driver's seat. *Id.* The bags contained buckets with what appeared to be water softening salt pebbles. *Id.*; *see also* Tr. at 17 (Mot. Hr'g, August 26 & 29, 2016). When the buckets were opened, Richey saw heat sealed plastic bags protruding from the pebbles. Richey Report, Gov. Ex. 58-1; *see also* Tr. at 17 (Mot. Hr'g, August 26 & 29, 2016). Blitz presented a positive alert to the presence of narcotics odor. Richey Report, Gov. Ex. 58-2.

Schmitz requested a tow truck for Defendants' vehicle at 12:04 p.m., handcuffed the Defendants, and placed them in the back of the patrol vehicle. Tr. at 18, 143 (Mot. Hr'g, August 26 & 29, 2016); *see also* Schmitz Report at 7, Gov.'s Ex., 23-7. Schmitz called the dispatcher again at 12:24 to let her know that Defendants were in custody, and that the patrol vehicle was en route to the station. Tr. at 143-44 (Mot. Hr'g, August 26 & 29, 2016)

The two bags recovered from Defendants' vehicle were filled with 8.41 pounds of a substance that field tested positive for methamphetamine, which has a street value in Guam of approximately $1,907,354.36.[22] Defendants were then arrested and placed in the custody of HSI Los Angeles. *Id.*

## II. STANDARD OF REVIEW

---

[21] patrol vehicle and determined that it was a tracking device. *Id.* Schmitz was unaware of the tracker prior to this, and retained it in his patrol car. *Id.* at 14-15.

[21] Schmitz testified that he did not complete the citation because his canine alerted for possible contraband. *See* Tr. at 12 (Mot. Hr'g, August 26 & 29, 2016); Schmitz Report at 3, Gov.'s Ex. 23-3.

[22] Chavez testified that he field-tested the substance, which indicated the presence of methamphetamine.

16

In an evidentiary hearing on a motion to suppress, the Defendant has the burden of persuasion, in establishing that his own Fourth Amendment rights were violated by the challenged search or seizure. *United States v. Caymen*, 404 F.3d 1196, 1199 (9th Cir. 2005). The prosecution, as the proponent of the evidence, must bear the burden of proving its admissibility. *See United States v. Coades*, 468 F.2d 1061, 1064 (3d Cir. 1972); *United States v. Colbert*, No. 89-310, 1990 WL 5200 at *1 (D.N.J. January 23, 1990) (citing *Katz v. United States*, 389 U.S. 347 (1967)).

On a motion to suppress, the controlling burden of proof imposes no greater burden than proof by a preponderance of the evidence. *See United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974).

### III.    DISCUSSION

Defendants first argue that TPD Officers Schmitz and Craft lacked independent probable cause to stop Defendants' vehicle because the patrol officers and the surveillance team failed to observe Defendants engage in any narcotics related behavior. *See* Mot. Suppress Narcotics at 16-17, ECF No. 24. In their view, this failure to establish probable cause, along with the purported perjury by the officers and agents, cannot satisfy the automobile exception to the Fourth Amendment to permit the warrantless search of Defendants' vehicle. *Id.* at 17. Second, Defendants maintain that the traffic stop, search and seizure was an unreasonably prolonged detention in violation of *Rodriguez v. United States*, 135 S. Ct. 1609 (2015). Reply at 6, ECF No. 64.

In response, the United States contends that Matanguihan and Hernandez's financial investigation commencing in July of 2014, as well as the intercepted conversations between the C.D., established probable cause to search Defendants' vehicle on June 4, 2015. Opp'n at 2-10, ECF No. 38. This probable cause was imputed to Schmitz, Craft, and Richey through the

collective knowledge doctrine upon Schmitz's receipt of Vazquez's phone call, thus permitting the officers to conduct a warrantless search under the automobile exception. *See id.* at 9-10. Alternatively, the United States contends that if the search of Defendants' vehicle was illegal, then the inevitable discovery doctrine purges the taint of any improper behavior by the officers and agents involved. United States' Supplemental Brief at 12, ECF No. 187.

To resolve these arguments, this court must determine (1) whether the stop was of an unreasonable duration in violation of *Rodriguez*, and (2) whether probable cause or reasonable suspicion was present to believe that Defendants were engaged in narcotics activity and that such cause or suspicion was properly imputed to Schmitz, Craft and Richey through the collective knowledge doctrine set forth in *United States v. Ramirez*, 473 F.3d 1026 (9th Cir. 2007) to permissibly prolong their detention and justify the underlying search.

### A. Whether the Duration of the Stop violated *Rodriguez*.

The United States argues that the duration of the traffic stop was reasonable under *Rodriguez* because (1) Schmitz had not completed his traffic citation by the time Richey and Blitz arrived at the scene, (2) any delay was *de minimis*, (3) that Richey had independent reasonable suspicion or probable cause to prolong the stop because driving with a suspended license is an arrestable offense, or (4) that the collective knowledge doctrine permitted Defendants' prolonged detention. *See* United States' Supplemental Brief at 12-16, ECF No. 187. Defendants counter that the traffic stop was unreasonably prolonged in violation of *Rodriguez* because the stop was predicated on traffic violations. Martinez's Supplemental Brief at 6, 10, ECF No. 196. Defendants urge that the representations by the officers and agents involved in this case regarding the stop's timeline were disingenuous, and believe the length of their detention was unjustified. *Id.* at 10-13.

The Ninth Circuit has "recognize[d] that an officer may prolong a traffic stop if the prolongation itself is supported by independent reasonable suspicion." *United States v. Evans*, 786 F.3d 779, 788 (9th Cir. 2015) (citing *Rodriguez*, 135 S. Ct. at 1615); *see also United States v. Mendez*, 476 F.3d 1077, 1080 (9th Cir. 2007). Reasonable suspicion is present "when an officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for *particularized* suspicion." *Id.* (quoting *United States v. Montero–Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (en banc)).

This court need not resolve the question of whether Schmitz had independent probable cause or reasonable suspicion for the traffic stop itself, because even if he did, the length of Defendants' detention exceeded the period of time reasonably necessary to carry out the purposes of the traffic stop. *See United States v. Motley*, 344 F. App'x 445, 446 (9th Cir. 2009) (citing *Illinois v. Caballes*, 543 U.S. 405, 407 (2005) ("A seizure that is justified solely by the interest in issuing a [traffic] ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission.")).

In *Rodriguez*, the Supreme Court acknowledged that "[a] seizure for a traffic violation justifies a police investigation of that violation." 135 S. Ct. at 1614. A traffic stop is often "a relatively brief encounter . . . more analogous to a so-called *Terry* stop . . . than to a formal arrest." *Id.* (alteration omitted) (quoting *Knowles v. Iowa*, 525 U.S. 113, 117 (1998)). Much "[l]ike a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's mission—to address the traffic violation that warranted the stop." *Id.* (citations and internal quotations omitted). Furthermore, "[t]he scope of the detention must be carefully tailored to its underlying justification," and "[b]ecause addressing the infraction is the purpose of the stop, it may last no longer than is necessary to effectuate th[at] purpose." *Id.* (third alteration in original) (citations and internal quotations omitted). Consequently, the

"[a]uthority for the seizure . . . ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* (citing *United States v. Sharpe*, 470 U.S. 675, 686 (1985)).

When determining whether the duration of a stop was reasonable, "it [is] appropriate to examine whether the police *diligently* pursued [the] investigation." *Id.* (alterations in original) (emphasis added) (citing *Sharpe*, 470 U.S. at 686).

The timeline of *Rodriguez* was strikingly similar to this case. The overall duration of the stop in *Rodriguez* was 29 minutes. 135 S. Ct. at 1617 (J. Kennedy, concurring). There, the defendant was pulled over at 12:06 a.m., and the written warning was completed by 12:27 or 12:28 a.m. *Id.* at 1612-13. The traffic officer instructed the defendant to wait until a K-9 unit arrived at 12:33 a.m. *Id.* at 1613. Seven or eight minutes elapsed between the time the warning was issued and the dog positively alerted to the presence of drugs. *Id.*

Applying the principles set forth in *Caballes* and *Knowles*, the Supreme Court determined that the traffic stop at issue in *Rodriguez* was impermissibly prolonged beyond the time reasonably required to complete the stop's mission.[23] *Id.* at 1616. Although an officer is permitted to "conduct certain unrelated checks during an otherwise lawful traffic stop," the officer "may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual" *Id.* at 1615.

Unlike a traffic stop, which generally involves ordinary inquiries incident to the stop, the purpose of conducting a dog sniff is to "detect evidence of ordinary criminal wrongdoing." *Id.* at

---

[23] A traffic officer's mission usually "includes 'ordinary inquiries incident to [the traffic] stop,'" such as inspecting the driver's license, automobile registration, and proof and insurance, and determining whether there are any outstanding warrants against the driver *Rodriguez*, 135 S. Ct. at 1615 (quoting *Caballes*, 543 U.S., at 408); *see also Delaware v. Prouse*, 440 U.S. 648, 658–660 (1979); W. LaFave, Search and Seizure § 9.3(c), pp. 507–517 (5th ed. 2012). The purpose of theses checks is aimed at ensuring "that vehicles on the road are operated safely and responsibly." *Id.* (citations omitted).

1616-16 (alteration omitted) (quoting *Indianapolis v. Edmond,* 531 U.S. 32, 40–41 (2000)); *see also Florida v. Jardines*, 133 S.Ct. 1409, 1416–17 (2013). Thus, because it "[l]ack[s] the same close connection to roadway safety as the ordinary inquiries, a dog sniff is not fairly characterized as part of the officer's traffic mission." *Id.* "Consequently, a dog sniff that 'prolong[s] [the stop] beyond the time reasonably required to complete th[e] mission of issuing a ticket for' the traffic offense, 'violates the Constitution's shield against unreasonable seizures' unless the officer had independent reasonable suspicion to support such a prolongation." *United States v. Evans*, 786 F.3d 779, 787–88 (9th Cir. 2015) (alterations in original) (quoting *Rodriguez*, 135 S. Ct. at 1612).

In this case, the traffic stop commenced at approximately 11:10 a.m., and the DMV Return for Martinez's license showing that his license was suspended or revoked appears to have been transmitted by 11:15 or 11:17 a.m. *See* Schmitz Report at 3, 6-7, Gov.'s Ex. 23-3. 23-6-7. Yet Schmitz's citation indicates he did not begin preparing it until 11:33 a.m. *Id.* The justification for this delay is that Schmitz needed to ask Martinez follow-up questions due to his suspended license, and also that he needed to look up traffic code violations. *See* Tr. at 157-58, 198 201, 211-12 (Mot. Hr'g, August 26 & 29, 2016).

The court is not convinced by the United States' argument that this case is distinguishable from *Rodriguez*, and the delay justified, because Schmitz did not finish his citation. If viewed solely as a traffic stop, the duration of the stop was objectively unreasonable. The twenty-three (23) minute delay between the stop and the time that Schmitz began writing the citation demonstrates, at best,[24] a lack of diligence by Schmitz in pursuing the traffic investigation.

Objectively, Schmitz's issuance of a traffic citation for Martinez's abrupt lane change and speeding violation should have been completed much earlier. The United States' argument,

---

[24] At worst, Schmitz's testimony suggests a lack of candor to this court.

and Schmitz's representation, that the traffic stop was justifiably prolonged by Martinez's suspended license is unavailing. Schmitz was aware of the driver's license violation, and all other traffic violations, no later than 11:17 a.m. *See* Schmitz Report at 3, 6-7, Gov.'s Ex. 23-3, 23-6-7. The decision to wait sixteen minutes before preparing the "Notice to Appear" citation does not satisfy his duty to diligently pursue the investigation mandated by *Rodriguez*. It is immaterial that Schmitz *could have* arrested Martinez for the suspended license. The "Notice to Appear," with the scheduled hearing date of August 15, 2015, demonstrates Schmitz's election to issue a citation to Martinez, rather than to arrest him. *See* Notice to Appear, Gov.'s Ex. 39.

Additionally, Schmitz's request for a K-9 to conduct a dog sniff case cannot be fairly characterized as part of Schmitz's traffic mission. *See Rodriguez*, 135 S. Ct. at 1614. The narcotic dog's search could not uncover any additional evidence of Martinez's traffic violations.

This court is not convinced by the United States' argument that receiving the call from a vice and narcotics detective in and of itself established Schmitz's *independent* probable cause or reasonable suspicion to prolong Defendants' detention. There was no testimony establishing that Defendants appeared nervous, that the officers smelled air freshener, or that there was any other independent observation that Defendants were otherwise engaged in illicit drug activity.[25] *See* Tr. at 202 (Mot. Hr'g, August 26 & 29, 2016). Rather, Schmitz merely testified that upon receiving a call from a vice and narcotics detective, he "would like to" stop Defendants' vehicle. *Id.* at 26.

_____

[25] A district court should make findings of historical fact when determining whether the traffic officer obtained individual probable cause or reasonable suspicion. *Evans*, 786 F.3d at 788 (citing *United States v. Valdes–Vega*, 738 F.3d 1074, 1077 (9th Cir.2013) (en banc); *see also Rodriguez*, 135 S. Ct. at 1622 ( J. Kennedy, dissenting) (suggesting that reasonable suspicion to prolong the stop for the canine sniff was established by (1) the overwhelming odor of air freshener coming from the vehicle, which the officer testified in his experience was a common attempt to conceal certain odors from police, (2) the defendant's passenger seemed nervous and would not make eye contact.).

Hence, because Schmitz's traffic stop did not reveal independent evidence of illicit narcotics activity, the outcome of this case turns on whether Vazquez obtained information amounting to reasonable suspicion or probable cause that could be imputed to Schmitz through the collective knowledge doctrine. *See Motley*, 344 F. App'x at 446.

**B. Whether the Collective Knowledge Doctrine is Satisfied.**

The United States contends that the collective knowledge doctrine rendered the stop of Defendants' vehicle and subsequent seizure of the narcotics permissible. *See* United States' Supplemental Brief at 9, ECF No. 187. In response, Defendants argue that the calls between Vazquez and Schmitz were insufficient to satisfy the collective knowledge doctrine, because Schmitz was not directed or ordered to conduct a traffic stop, and because probable cause was lacking. Moser's Supplemental Brief at 2, 7-8, 11, ECF No. 195.

The Ninth Circuit Court of Appeals has applied the collective knowledge in two situations: (1) "where law enforcement agents are working together in an investigation but have not explicitly communicated the facts each has independently learned," and (2) "where an officer (or team of officers), with direct personal knowledge of *all* the facts necessary to give rise to *reasonable suspicion or probable cause*,[26] directs or requests that another officer, not previously involved in the investigation, conduct a stop, search, or arrest." *Ramirez*, 473 F.3d at 1032-33 (emphasis added). Thus, this court must determine (1) whether reasonable suspicion or probable cause was present in this case, and (2) whether Vazquez's communication to Schmitz was sufficient to invoke the collective knowledge doctrine. Moser's Supplemental Brief at 12, ECF No. 195.

---

[26] "The Fourth Amendment applies to seizures of the person, including brief investigatory stops such as the stop of the vehicle . . . . An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *See United States v. Cortez*, 449 U.S. 411, 417 (1981) (citations omitted).

23

**1. Whether Schmitz and Richey Had Reasonable Suspicion or Probable Cause to Stop Defendants' Vehicle.**

The United States maintains that the preliminary financial investigation of Defendants and the intercepted phone calls established probable cause in this case. *See* United States' Supplemental Brief at 2-7, 11, ECF No. 187. In opposition, Defendants urge that probable cause was lacking because (1) Fejeran admitted during his testimony that the C.D. and Defendants only discussed narcotics trafficking, but that Defendants never told the C.D. that they had engaged in narcotics trafficking, (2) Defendants have no history of narcotics trafficking, (3) there are no narcotics transactions between the C.D. and Defendants, (4) there was no use of any drug code language in the recordings, (5) there was no visual surveillance of Defendants consistent with the behavior of narcotics traffickers, (6) visual surveillance did not establish the two buckets containing methamphetamine being placed in Defendants' vehicle, (7) the $15,000.00 that Defendants gave the C.D. was seized before it could be given to Defendants, and (8) there were no personal meetings in California between the C.D. and Defendants. Moser's Supplemental Brief at 12, 14, ECF No. 195.

The Ninth Circuit and District Courts within the Ninth Circuit acknowledge that both probable cause and reasonable may be imputed through the collective knowledge doctrine to justify an investigatory stop for a vehicle. *See United States v. Villasenor*, 608 F.3d 467, 471–72 n.5 (9th Cir. 2010); *see also Motley*, 344 F. App'x 449 (suggesting reasonable suspicion to prolong a traffic stop could be imputed for collective knowledge purposes, but concluding reasonable suspicion of communicating officer was lacking (unpublished)); *United States v. Mayorquin*, No. CR 12-1076-CAS, 2013 WL 5405704, at *3–4 (C.D. Cal. Sept. 20, 2013) (concluding that phone calls using coded language with respect to a narcotics trafficking and observation of black bag being placed in defendant's vehicle established reasonable suspicion, and perhaps even probable cause).

24

Probable cause exists where the facts available to an officer "suggest a 'fair probability' that the suspect has committed a crime." *See Tatum v. City & Cty. of San Francisco*, 441 F.3d 1090, 1094 (9th Cir. 2006) (citations omitted); *see also Ornelas v. United States*, 517 U.S. 690, 696 (1996) ("probable cause to search . . . exist[s] where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." (citations omitted)).

Reasonable suspicion, on the other hand, is less demanding than probable cause, but may be imputed under the collective knowledge doctrine as well. *See United States v. Sokolow*, 490 U.S. 1, 7 (1989) (citing *United States v. Montoya de Hernandez*, 473 U.S. 531, 541 (1985); *see also Ramirez*, 473 F.3d at 1033. Although "[c]ourts have used a variety of terms to capture the elusive concept of what cause is sufficient to authorize police to stop a person," the terms provided such as "'articulable reasons' and 'founded suspicion' are not self-defining; they fall short of providing clear guidance dispositive of the myriad factual situations that arise." *Id.*[27] Thus, a court "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *Cortez*, 449 U.S. at 417-18). This standard permits "officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Id.* (quoting *Cortez*, 449 U.S. at 418).

---

[27] The Supreme Court has cautioned that probable cause and reasonable suspicion "are not 'finely-tuned standards,' comparable to the standards of proof beyond a reasonable doubt or of proof by a preponderance of the evidence." *Ornelas*, 517 U.S. at 696 (citing *Illinois v. Gates*, 462 U.S. 213, 231 (1983)). Instead, "[t]hey are . . . fluid concepts that take their substantive content from the particular contexts in which the standards are being assessed." *Id.* (citations omitted).

25

The Ninth Circuit's decision in *United States v. Villasenor*, which reversed the District Court's decision to suppress drug evidence, is instructive in this case. 608 F.3d 467, 470 (9th Cir. 2010). There, an ICE agent interviewed a drug smuggler who admitted to being involved in a larger drug trafficking organization. *Id.* at 470. The smuggler informed the agent that in the near future he was to meet up with a "load vehicle" and a "scout vehicle" to effectuate a drug transfer. *Id.* ICE determined the license plate number of the "scout vehicle" from a photograph. *Id.* The following morning, the defendant drove the "scout vehicle" across the border from Mexico. *Id.* The vehicle was referred for secondary inspection at the border, but the narcotics detecting dog did not alert upon sniffing the vehicle. Later that morning, the agent happened to pull alongside the scout vehicle at a traffic light. *Id.* Rather than stopping the vehicle himself, the agent requested the local police department to send a marked police car to conduct a traffic stop of the defendant's car. *Id.* The agent requested this stop "to avoid getting 'burned,' i.e. to avoid having his car recognized as a vehicle involved in drug interdiction." *Id.* at 470 n.4. The patrol officer who responded to the call pulled defendant over upon noticing a ten-inch rosary, which violated a California law against objects that obstruct the driver's clear view through the windshield. *Id.* at 470-71 (citation omitted). The agent arrived at the scene soon after, and called a narcotics detecting dog officer to conduct a sniff. *Id.* at 471. An officer arrived with the dog forty-five minutes later, and alerted during the ensuing dog sniff. *Id.*

The defendant in *Villasenor* argued that the initial failed dog sniff at the border should be imputed to the other officers through the collective knowledge doctrine. *Id.* at 475. The court, however, determined that the doctrine was inapplicable because there was no communication between the ICE agent and the Customs and Border Patrol (CPB) agents who conducted the border search, and also because there was no evidence that the CPB agents were directed or

requested by the ICE agent to stop, search, or arrest the defendant. *Id.* at 475-76 (footnote and citation omitted).

Although the court declined to apply the collective knowledge doctrine to impute the failed CPB dog sniff to the ICE agent, the Ninth Circuit concluded that the collective knowledge doctrine was applicable for the second stop at issue in the case. *Id.* at 472 n.5. Specifically, the Ninth Circuit determined that it did not need to "discuss the validity of the rosary-based traffic stop" because the collective knowledge doctrine imputed the ICE agent's knowledge of the smuggler's and observation of the defendant's unusual behavior to the patrol officer. *Id.* (citing *Ramirez*, 473 F.3d 1031–32). "Thus, whether [the patrol officer] had probable cause to believe that the rosary hanging from Villasenor's rearview mirror 'obstruct[ed] or reduce[d Villasenor's] clear view through the windshield,' was irrelevant" because the search and seizure of the vehicle was justified if the ICE agent had reasonable suspicion. *Id.* (citing Cal. Veh.Code § 26708(a)(2); *Ramirez,* 473 F.3d at 1031) ("'[I]t does not matter that [the patrol officer] was directed to make a 'traffic stop,' nor does it matter whether he had valid grounds to make the traffic stop because of [a hanging rosary]. If [the ICE agent] had [reasonable suspicion], then the seizure and search of the vehicle [was] justified.'")). Ultimately, the court concluded that the length of the stop was justified because the ICE agent had "reasonable suspicion that [defendant] was involved in criminal activity." *Id.*

Similarly, in *Mayorquin*, the collective knowledge doctrine entitled a patrol officer to stop the defendant's vehicle for further investigation when federal drug enforcement agents with reasonable suspicion communicated their request to the patrol officer. *See* 2013 WL 5405704, at *3–4. There, government agents recorded multiple conversations between the defendant's son Victor Suarez and co-defendant Sergio Vargas. *Id.* at *1. The contents of the intercepted conversations included a request by Vargas to Suarez that "he was 'in need of an errand . . . from

a place in Los Angeles . . . to a place in San Jose" that "involved 'seven shirts' and that it would be 'paid right away there.'" *Id.* (citation omitted). Another conversation referenced "'six little dolls,'" a comment by Suarez that the defendant wondered "why [they] are doing all this under so much pressure," and an indication by Suarez that he would ask his uncle if they could "store them there" to which Vargas inquired "'Your uncle is trustworthy, right?'" *Id.* (citations omitted). The references to "seven shirts" and "six little dolls" were understood by the officers to be coded references to seven and six pounds of methamphetamine, respectively, that Vargas wanted to transport. *Id.* Prior to the stop, the surveillance team also witnessed Suarez place a weighted black bag into the rear of defendant's vehicle. *Id.* (citation omitted).

The federal agents requested a California Highway patrol officer to locate the defendant's vehicle. *Id.* at *2. The patrol officer stopped the vehicle after determining that the vehicle was speeding. *Id.* After a traffic citation was issued, defendant consented to a search, and a drug detecting dog examined and alerted to the vehicle. *Id.* The defendant challenged the initial stop on three grounds: first that probable cause to search her vehicle was lacking, and second that she did not give valid consent, and third, that the search exceeded the scope of her consent. *Id.* The District Court determined that the traffic officer was entitled to stop the vehicle to investigate it for narcotics "even if [the patrol officer] had not observed a traffic violation." *Id.* at *2. Even if probable cause was lacking, the court noted that reasonable suspicion would permit the patrol officer to investigate defendant's vehicle for narcotics. *Id.* at *3 (citation omitted). Furthermore, the court was not required to "evaluate reasonable suspicion from the perspective of [the patrol officer] alone," but instead could "look to the collective knowledge of all the officers involved in the criminal investigation.'" *Id.* (alteration omitted) (quoting *Sutton*, 794 F.2d at 1426).

The collective knowledge of the surveillance team included information from the intercepted phone conversations, and "based on their training and experience, the officers were

able to decipher the conversations between Vargas and Suarez and conclude that they were planning to smuggle methamphetamine from Los Angeles to San Jose with the assistance of defendant." *Id.* (footnote omitted). Although the government's interpretations of the purportedly coded language was not conclusive, it was "nonetheless relevant to determining whether the officers had probable cause or reasonable suspicion to believe the vehicle was transporting narcotics." *Id.* (citing *United States v. Beltran*, 11 Fed. App'x 786, 787 (9th Cir.2001).

The government's interpretation of the intercepted conversations was corroborated by the surveillance, which revealed a "weighted black bag" being placed in defendant's vehicle. *Id.* The district court acknowledged this evidence "may . . . rise to the level of giving the officers probable cause to believe that the vehicle contained narcotics," but "[e]ven if it does not, the coded conversations and subsequent surveillance certainly gave the officers 'reasonable suspicion to believe that criminal activity may be afoot.'" *Id.* at *3-4 (quoting *Arvizu*, 534 U.S. at 273). The officers' deduction that narcotics were being transported "'was not the product of an 'inchoate and unparticularized suspicion or hunch,' but was instead a 'reasonable inference' based on the facts available to them." *Id.* (quoting *Terry*, 392 U.S. at 27. Thus, "[u]nder the collective knowledge doctrine, [the patrol officer] was . . . entitled to stop defendant's vehicle for further investigation." *Id.*

Consequently, Schmitz's investigatory stop of Defendants' vehicle in this case does not require the surveillance team to have probable cause to prolong Defendants' detention to conduct a dog sniff. *See Mayorquin*, 2013 WL 5405704, at *3–4. Rather, Vazquez's "reasonable suspicion to believe that criminal activity 'may be afoot'" was sufficient to impute Schmitz if there was a minimal communication between the two. *Id.* at *3–4. This is because a court evaluates reasonable suspicion not from Schmitz's perspective alone, but instead "'look[s] to the

collective knowledge of all the officers involved in the criminal investigation.'" *Id.* at *3–4 (alteration in original) (quoting *Arvizu*, 534 U.S. at 273; *United States v. Sutton*, 794 F.2d 1415, 1426 (9th Cir.1986)).

Defendants' recorded conversations with the C.D. established at least reasonable suspicion that perhaps even rises to probable cause.[28]  *See id.* at *3 (concluding reasonable suspicion existed upon intercepted phone calls using coded language with respect to a narcotics trafficking).

Even though the conversations do not explicitly reference narcotics, the officers involved in this case could draw upon their specialized training to infer and deduce that Defendants and the C.D. were referring to narcotics.  *See Arvizu*, 534 U.S. at 273 (quoting *Cortez*, 449 U.S. at 417-18).[29]  Martinez indicated that he and Moser had sourced people to run "it across the main border, in from . . . Mexico" from individuals who have "it down to a science," and can "rock it back up" from liquid.  Gov.'s Ex. 60-9.  This is suspicious because it is unnecessary to run

[28] The court is not persuaded by the United States' argument that the fact that a California Magistrate Judge issued a tracking warrant on June 3, 2015 establishes that there was probable cause to search Defendants' vehicle on June 4, 2015.  *See* United States' Supplemental Brief at 11, ECF No. 187.  Chavez filed an Affidavit in Support of Application for a Tracker Warrant on June 3, 2015.  Sealed portions of Chavez's Affidavit reference the meetings between the C.D. and the Defendants, yet does not hedge that an inference was drawn from the conversations, based upon his training and experience as a vice and narcotics officer, that Defendants were referring to methamphetamine.  Rather, the sealed portion directly states that discussions were made by Defendants and the C.D. that there was incriminating statements regarding overt acts to smuggle methamphetamine from California to Guam.

The court finds no merit to Defendants' argument that the sealed portion of the Affidavit was never filed because it includes the same file stamped date as other portions of the Affidavit.  The court is still troubled, however, that Chavez was less than forthright to the California Magistrate Judge in framing the factual scenario at issue in obtaining the tracking warrant.

[29] An officer may not, however, rely "on a mere 'hunch' . . . to justify a stop."  *Arvizu*, 534 U.S. at 273 (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968).  Although "the likelihood of criminal activity need not rise to the level required for probable cause," the reasonable suspicion threshold "falls considerably short of satisfying a preponderance of the evidence standard."  *Id.* (citing *Sokolow*, 490 U.S. at 7).

30

Morton Rock Salt across the border from Mexico, make it into a liquid for transport, and rock it back up for the purpose of using it in a Jacuzzi.

Matanguihan's suspicions were further raised when Defendants discussed the unusual and complicated plan to transport pool supplies using "(1) air freshener to hide "it" in rock salt, which matches the consistency of the enigmatic "it," (*See* Gov.'s Exs. 62-7-8-9-26), (2) the discussion of the C.D.'s unusually high "cut" of $100,000.00-$200,000.00 for the transport of pool supplies (*See* Gov.'s Exs. 62-27-28), (3) the necessity of recreating Morton Salt labels and buckets for the purpose of putting the "thing" in (*See* Gov.'s Exs. 63, 64-2, 65, 66-2-3), (5) Martinez's indication that he would wear gloves to avoid fingerprints, and use alcohol to wipe the buckets down (*See* Gov.'s Ex. 64-21), (6) Defendants request to the C.D. that he carry fifteen thousand to California (*See* Gov.'s Ex. 65, 66-3-4-5), (7) Martinez's references to credit being "good" in San Diego (*See* Gov.'s Exs. 65, 66-5, and (8) Martinez's hesitance to bring "this" into his mother's house out of respect for her (Gov.'s Ex. 64-14). Although narcotics were not directly mentioned by name, based upon Matanguihan's training and experience, he could infer that the planned use of air freshener, gloves, and alcohol on the buckets was related to narcotics activity, particularly in light of the extensive "cut" offered to the C.D. for the transport of pool supplies. Additionally, when viewed in context, it is suspicious that Martinez would be concerned about bringing items into his mother's home unless some kind of illicit activity was planned.

Once Defendants reached San Diego, Defendants told the C.D. on multiple occasions that everything was "good to go," that they were ready to" rock and roll," and that they secured a "good enough amount" that was perhaps "seven." *See* Gov.'s Exs. 52, 53b-4, 54, 55c-3, 57a-4. Like *Mayorquin*, where the officers involved understood the reference to "seven shirts" and "six little dolls" to refer to narcotics for reasonable suspicion purposes, it was reasonable for the

officers involved in this case to conclude that Defendants' references to "seven," and a "jet ski," were allusions to a planned narcotics transaction. *See* 2013 WL 5405704, at *3–4.

Even without the specialized training of an officer, the court views the above referenced facts as producing a "reasonable inference" that narcotics were being transported rather than an "inchoate and unparticularized suspicion or hunch." *See id.* The court can reasonably conclude, even absent Matanguihan's testimony regarding his interpretation of this language, that Defendants desire to "drop this thing" to the C.D. in his trunk and Martinez's concern about the cops near Vons established reasonable suspicion, and perhaps even probable cause, to believe that "criminal activity [might] be afoot."[30] *Arvizu*, 534 U.S. at 273; *see also* Gov.'s Exs. 54, 55c-2-3, 56, 57b-1-3.

Because reasonable suspicion can permissibly prolong a traffic stop, the search does not run afoul of *Rodriguez*. *See Evans*, 786 F.3d at 788 (recognizing an officer may prolong a traffic stop if the prolongation is supported by independent reasonable suspicion); *see also Motley*, 344 F. App'x at 446–47.

Before concluding that the collective knowledge doctrine is applicable in this case, the court must look to the sufficiency of the communications between Vazquez and Schmitz.

### 2. Whether Vazquez's Communication to Schmitz was Sufficient to Invoke the Collective Knowledge Doctrine.

According to the United States, when Vazquez made a communication to Schmitz that Schmitz interpreted as a request to make a "wall stop," the doctrine's minimal requirement of a communication between officers was satisfied. *Id.* at 9-10. The facts establishing probable cause were then imputed to Schmitz during the traffic stop because (1) Matanguihan informed

---

[30] Looking to the "totality of the circumstances," the recorded conversations establish "a particularized and objective basis for suspecting legal wrongdoing," even absent a visual observation of a suspicious transfer or package being transported to Defendants' vehicle. *See. Arvizu*, 534 U.S. at 273 (quoting *Cortez*, 449 U.S. at 417-18).

1    Hernandez about the recorded meetings, (2) Matanguihan told Hernandez to prepare an
2    operations plan to preserve the C.D.'s involvement, (3) Vazquez was a member of the
3    surveillance team briefed by Hernandez, and (4) Vazquez informed Schmitz about Defendants'
4    vehicle. *Id.* at 10-11. In response, Defendants first argue that the collective knowledge doctrine
5    is inapplicable because Schmitz and Craft had no interaction with the surveillance team prior to
6    the traffic stop, other than two phone calls with Vazquez. Moser's Supplemental Brief at 7, ECF
7    No. 195. In Defendants' assessment, the collective knowledge doctrine is inapplicable because
8    Schmitz, Craft, and Richey could not fairly be characterized as a working part of the "team"
9    investigating Defendants. *Id.* at 2. Second, Defendants argue that the collective knowledge
10   doctrine is inapplicable because Schmitz was not directed or ordered to conduct a traffic stop.
11   *Id.* at 8.

12         The collective knowledge doctrine poses "a limited requirement that there be a
13   communication but not necessarily the conveyance of any actual information among officers."
14   *Ramirez*, 473 F.3d at 1031(footnote omitted). This requirement distinguishes officers working
15   together as a team from independent actors who are investigating the same subject by chance.
16   *See id.* (quoting *United States v. Terry,* 400 F.3d 575, 581 (8th Cir.2005); *see also United States*
17   *v. Bernard*, 623 F.2d 551, 561 (9th Cir. 1979)).

18         In an unpublished decision, the Ninth Circuit held that the collective knowledge doctrine
19   was applicable to a "walled off" stop. *United States v. Covarrubias*, 302 F. App'x 702, 703 (9th
20   Cir. 2008). There, the defendant conceded that the task force investigating him had probable
21   cause to search his vehicle for cocaine, but contended that insufficient communication was
22   conveyed for collective knowledge purposes during the "walled off" stop. *See id.* The court was
23   unpersuaded by this argument, and held that the collective knowledge doctrine is applicable
24   during a "walled off" stop because:

33

Where one officer knows facts constituting reasonable suspicion or probable cause (sufficient to justify action under an exception to the warrant requirement), and he communicates an appropriate order or request, another officer may conduct a warrantless stop, search, or arrest without violating the Fourth Amendment.

*Id.* (citing *Ramirez*, 473 F.3d at 1037). [31]

The Ninth Circuit held in *Ramirez* that the collective knowledge doctrine "includes no requirement regarding the *content* of the communication that one officer must make to another." *Ramirez*, 473 F.3d at 1037. Unlike the first stop at issue in *Villasenor*, this case does not present a situation where there was no communication amongst officers. *See* 608 F.3d 470-71.

Furthermore, "there is no requirement that the traffic violation [must] . . . be[] related to the grounds upon which the officers could have stopped the vehicle to search for contraband." *Ramirez*, 473 F.3d at 1031 n.2. The subjective purpose of Schmitz's stop "play[s] no role in the Fourth Amendment analysis." *See Ramirez*, 473 F.3d at 1030 (citing *Whren v. United States*, 517 U.S. 806, 811–13) (observing that the officer's subjective purpose was immaterial because probable cause was imputed through the collective knowledge doctrine, even when the lane straddling did not interfere with other vehicles and the co-defendant's arrest for his Mexican driver's license were improper); *see also United States v. Willis*, 431 F.3d 709, 715 (9th Cir. 2005) ("*Whren* stands for the proposition that if the officers have probable cause to believe that a traffic violation occurred, the officers may conduct a traffic stop even if the stop serves some other purpose.").

----

[31] Other jurisdictions have held that the collective knowledge doctrine's permissibly imputed reasonable suspicion to prolong a traffic stop to conduct a narcotics dog sniff, even when the degree of communication between officers is *de minimis*. *United States v. Heald*, 165 F. Supp. 3d 765, 775-76 n.14 (W.D. Ark. 2016) (citing *United States v. Gillette*, 245 F.3d 1032, 1034 (8th Cir.2001) (detectives reasonable suspicion based on observations and concerned citizens tip was attributable to traffic officer under the collective knowledge doctrine to permissibly prolong duration of defendant's seizure beyond the time necessary to investigate the underlying traffic infraction).

Accordingly, the fact that Schmitz interpreted Vazquez's communication as suggesting he make a "walled stop" does not preclude application of the collective knowledge doctrine. This is because (1) the surveillance team possessed reasonable suspicion or probable cause justified prolonging the stop to conduct a dog sniff, and (2) there was a communication by a member of the surveillance team to Schmitz regarding Defendants' vehicle to Schmitz. *Id.* at 1030-31; *see also id.* at 1037 (Kozinski, J., concurring) ("This is not a case where the investigating officers ordered a fellow officer to conduct a traffic stop because *they* lacked probable cause[32] for a narcotics stop. . . . [T]hat the arresting officer made it look like a 'traffic stop' . . . did not change the nature of the stop, which remained—in substance—a narcotics stop." (emphasis in original)).

It is immaterial that Vazquez conveyed limited information regarding Defendants to Schmitz during the two phone calls. The doctrine is clear that a "communication but not necessarily the conveyance of any actual information among officers" is required. *See Ramirez*, 473 F.3d at 1031(footnote omitted). Thus, Vazquez's communications to Schmitz in this case satisfied the minimal requirements of the collective knowledge doctrine.

## IV. CONCLUSION

The court recognizes that today's decision reaches the outer boundaries of the collective knowledge doctrine, and stretches the confines of the Fourth Amendment itself. Nonetheless, the court is bound by the precedent of the Ninth Circuit, which permits reasonable suspicion or probable cause from an officer or team of officers to be imputed to another officer when a *de*

---

[32] Although J. Kozinski's concurrence refers to probable cause, the term "reasonable suspicion" could be substituted in its place because *Villasenor*, and *Mayorquin* acknowledge reasonable suspicion can be imputed as well. *See Villasenor*, 608 F.3d at 472 n.5 (citing *Ramirez*, 473 F.3d at 1037 (Kozinski, J., concurring)); *see also Mayorquin*, 2013 WL 5405704, at *3–4.

*minimis* communication is made. Although the lack of candor and inconsistent position of many of the United States' witnesses is deeply disturbing, this case satisfies the requirements of the collective knowledge doctrine. The imputed reasonable suspicion permitted Schmitz to prolong Defendants' detention during the traffic stop to await the K-9 unit. Therefore, Defendants' Motion to Suppress Narcotics is **DENIED**.

      **SO ORDERED.**



**/s/ Frances M. Tydingco-Gatewood**
    **Chief Judge**
**Dated: Oct 25, 2016**